**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| BRIAN BILAL STARKS, | ) No. CV 15-04627-AG (AS) |
| Petitioner, | ) **FINAL REPORT AND RECOMMENDATION** |
| v. | ) |
| ERIC ARNOLD, Warden, | ) **OF UNITED STATES MAGISTRATE** |
| Respondent. | ) **JUDGE** |

This Final Report and Recommendation is submitted to the Honorable Andrew J. Guilford, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

**I.**

**INTRODUCTION**

On June 18, 2015, Brian B. Starks ("Petitioner"), a California state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition"), pursuant to 28

1

U.S.C. § 2254. (Docket Entry No. 1). The Petition raises two grounds for habeas relief. (See Petition at 5).[1] On December 9, 2015, Respondent filed an Answer to the Petition ("Answer")(Docket Entry No. 15). On January 11, 2016, Petitioner filed a Reply. (Docket Entry No. 21).

On March 17, 2016, the Court issued a Report and Recommendation recommending that the Petition be denied. (Docket Entry No. 23). On April 27, 2016, Petitioner filed Objections to the Report and Recommendation (Docket Entry No. 26).

The Court issues this Final Report and Recommendation to clarify that voir dire took place over a three-day period and to correct a typographical error.

For the reasons stated below, it is recommended that the Petition be DENIED and that this action be DISMISSED with prejudice.

**II.**

**PROCEDURAL HISTORY**

On May 4, 2012, a Ventura County Superior Court jury convicted Petitioner of first degree murder in violation of California Penal Code ("P.C.") § 187(a), assault with a firearm in violation of P.C. § 245(a)(2), and possession of firearm by a felon in violation of

---

[1] All citations to filings in this case refer to the pagination provided by the Court's electronic docket.

P.C. § 12021(a)(1).   (4 C.T. 1069—1073).   The jury also found true the special allegations that Petitioner personally inflicted great bodily injury in committing the murder (P.C. § 12022.7(a)) and personally and intentionally discharged a firearm causing death (P.C. § 12022.53(d)).   (4 C.T. 1069).   On December 10, 2012, Petitioner was sentenced to an indeterminate  prison term of seventy-five years to life.  (6 C.T. 1564—65).

On June 21, 2013, Petitioner appealed his convictions to the California Court of Appeal (Case No. B244298).  (Docket Entry No. 17-11).   On April 30, 2014, the California Court of Appeal affirmed Petitioner's convictions in a reasoned decision.  (Docket Entry No. 17—14).   Petitioner filed a Petition for Review in the California Supreme Court.  (Docket Entry No. 17—15).   On July 9, 2014, the California Supreme Court issued an order summarily denying the Petition for Review without citation to authority.  (Docket Entry No. 17—16).

### III.
#### FACTUAL BACKGROUND

In summary, Petitioner, along with codefendants Corey Johnson and Terrance Morrow, arranged to sell cocaine to victim Michael Wade and two others.   Petitioner lured the victims inside an Oxnard residence under the pretext of consummating the drug transaction. Petitioner and codefendants, all of whom had firearms, turned on Wade and the other two victims.   In the ensuing melee, Petitioner fatally shot Wade before fleeing.  (Docket Entry No. 17—14, at 2—8).

Since Petitioner's claims for relief do not implicate the underlying facts of the crime, the facts pertinent to the grounds raised in this habeas petition will be discussed below.

**IV.**

**PETITIONER'S CONTENTIONS**

The Petition raises the following grounds for federal habeas relief:

| | |
|---|---|
| Ground One: | Petitioner's constitutional rights were violated under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), when the prosecutor exercised peremptory challenges against three potential Hispanic jurors. |
| Ground Two: | The trial court violated Petitioner's Sixth Amendment right to counsel by discussing jury notes outside the presence of Petitioner's trial counsel. |

(<u>See</u> Petition at 5, 9–31).

4

**V.**

**STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt [.]'" Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).

The term "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003); see also Cullen v. Pinholster, 131 S. Ct. at 1399; 1); Williams v. Taylor, 529 U.S. 362, 412 (2000) ("clearly established Federal law" consists of holdings, not dicta, of Supreme Court decisions "as of the time of the relevant state-court decision"). However, federal circuit law may still be persuasive authority in identifying "clearly established" Supreme Court law or in deciding when a state court unreasonably applied Supreme Court law. See Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Tran v. Lindsey, 212 F.3d 1143, 1154 (9th Cir. 2000).

A state court decision is "contrary to" clearly established federal law if the decision applies a rule that contradicts the governing Supreme Court law or reaches a result that differs from a result the Supreme Court reached on "materially indistinguishable" facts. Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); Williams, 529 U.S. at 405-06; see also Cullen v. Pinholster, supra ("To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court.").

A state court decision involves an "unreasonable application" of clearly established federal law "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407; Cullen v. Pinholster, supra; Woodford v. Visciotti, 537 U.S. 19, 24-27 (2002) (per curiam); Moore v. Helling, 763 F.3d 1011, 1016 (9th Cir. 2014) (courts may extend Supreme Court rulings to new sets of facts on habeas review "only if it is 'beyond doubt' that the ruling apply to the new situation or set of facts."), cert. denied, 135 S.Ct. 2361 (2015). A federal habeas court may not overrule a state court decision based on the federal court's independent determination that the state court's application of governing law was incorrect, erroneous or even "clear error." Lockyer, supra, 538 U.S. at 75; Harrington v. Richter, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit

precludes federal relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."). Rather, a decision may be rejected only if the state court's application of Supreme Court law was "objectively unreasonable." Lockyer, supra; Woodford, supra; Williams, 529 U.S. at 409; see also Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004) ("objectively unreasonable" standard also applies to state court factual determinations).

When a state court decision is found to be contrary to or an unreasonable application of clearly established Supreme Court law, a federal habeas court "must then resolve the [constitutional] claim without the deference AEDPA otherwise requires." Panetti v. Quarterman, 551 U.S. 930, 953 (2007); see also Williams, 529 U.S. at 406 (when a state court decision is contrary to controlling Supreme Court law, a federal habeas court is "unconstrained by § 2254(d)(1)"). However, the state court need not cite the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early, supra. If a § 2254(d)(1) error occurs, the constitutional claim raised must be considered de novo. Frantz v. Hazey, 513 F.3d 1002, 1012-15 (9th Cir. 2008); see also Rompilla v. Beard, 545 U.S. 374, 390 (2005).

Petitioner raised grounds one and two in his petition for review to the California Supreme Court, which denied the petition without comment or citation to authority. (Docket Entry No. 17-16). The Court "looks through" the California Supreme Court's silent denial to the last reasoned decision as the basis for the state court's

judgment.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); Cannedy v. Adams, 706 F.3d 1148, 1159 (9th Cir. 2013) ("[W]e conclude that *Richter* does not change our practice of 'looking through' summary denials to the last reasoned decision – whether those denials are on the merits or denials of discretionary review." (footnote omitted)), as amended, 733 F.3d 794 (9th Cir. 2013), cert. denied, 134 S. Ct. 1001 (2014). Therefore, the Court will consider the California Court of Appeal's reasoned opinion in addressing Petitioner's claims.  Berghuis v. Thompkins, 560 U.S. 370, 380 (2010). See Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991); Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992); see also Kennedy v. Lockyer, 379 F.3d 1041, 1052 (9th Cir. 2004); Gill v. Ayers, 342 F.3d 911, 917 n.5 (9th Cir. 2003).

## VI.

## DISCUSSION

### A.    Ground One

In Ground One, Petitioner contends that the trial court erred in denying Petitioner's two Wheeler/Batson motions.[2]  (Pet. at 9.)  In particular, Petitioner claims that the trial court erred by not

---

[2]    People v. Wheeler, 22 Cal.3d 258 (1978), is California's counterpart to Batson v. Kentucky, 476 U.S. 79 (1986).  A Wheeler motion is considered the procedural equivalent to a challenge made under Batson.  Paulino v. Castro, 371 F.3d 1083, 1088 n. 4 (9th Cir. 2004).

finding that the defendants had made a *prima facie* showing that the prosecutor exercised peremptory challenges of three potential Hispanic jurors in a discriminatory fashion. (Petition at 9—10).

### 1.   Factual Background

Before jury selection began, the parties agreed that the three defendants would each have 12 peremptory challenges and the prosecutor would have 36 peremptory challenges. (1 R.T. 58). The prospective jurors filled out questionnaires prior to participating in *voir dire*. (3 R.T. 368). The prosecutor and defense counsel conducted *voir dire* over a period of three days with jurors who were not excused for cause or hardship. (1 R.T. 64; 2 R.T. 204—06.). Jury selection began with an initial 47-person venire of potential jurors, followed by additional waves of jurors, until a final jury was selected on the third day. (See 2 R.T. 204—06; 3 R.T. 364.) Among the first 12 prospective jurors to fill the jury box were two Hispanic prospective jurors, Mr. Martinez and Ms. Garcia. (3 R.T. 370.)

The prosecutor exercised her first peremptory challenge against prospective juror Miss Barnes, and her second against Ms. Garcia. (3 R.T. 493). The prosecutor subsequently exercised her third and fourth peremptory challenges against prospective jurors Mr. Martinez and Mr. McMichael. (3 R.T. 533; 4 R.T. 600). Counsel for defendant

Johnson asked to approach the bench and a short discussion ensued off the record. (4 R.T. 600). During the recess, Petitioner joined in a Wheeler motion brought by Johnson's attorney, who argued "[t]here . . . appears to be what I believe is a systematic elimination of minorities." (4 R.T. 601—02). The trial court told the prosecutor, "I don't believe there's been a *prima facie* case, but I think the prudent thing to do is if you want to make any record." (4 R.T. 602). The prosecutor explained her reasons for excusing Mr. McMichael (an African-American prospective juror), but was not prepared to comment on her peremptory challenges of Ms. Garcia and Mr. Martinez because she did not have her notes. (Id.). The trial judge denied the motion on the basis that there was no *prima facie* case, but allowed the prosecutor to look at her notes and complete the record at a later time. (4 R.T. 603).

Following additional *voir dire*, the prosecutor exercised her fifth and sixth peremptory challenges to excuse prospective jurors Ms. Gramacki and Ms. Brooks. (4 R.T. 661—62). Mr. Colon, a prospective Hispanic juror, was asked to replace a seat in the jury box. (4 R.T. 665). During *voir dire*, Mr. Colon stated that he had a recent prior jury experience which was a criminal trial for burglary resulting in a hung jury. (4 R.T. 686—688). Mr. Colon also stated that his nephew had been unfairly prosecuted for stabbing a man in self-defense at a gas station in Oxnard. (4 R.T. 671).

The prosecutor exercised her seventh and eighth peremptory challenges to excuse prospective jurors Mr. Colon and Ms. Cline. (4 R.T. 691). Counsel for Johnson re-raised his Wheeler motion,

asserting an "exclusion of minorities." (4 R.T. 692). Counsel noted that Mr. Colon was Hispanic and stated that Johnson thought Miss Cline was "mixed [B]lack." The trial court ruled on the Wheeler motion as follows:

> That's denied out of hand. It's clear why she excused Mr. Colon. And Miss Cline appeared to be [W]hite and is 19 years old, and she told her I'm gonna excuse you 'cause you're too young. So right off the bat, we know why. So I don't think that there's any basis.

(4 R.T. 692).

At the end of jury selection, the trial court allowed the prosecutor to state on the record her reasons for exercising peremptory challenges against Hispanic potential jurors, Ms. Garcia and Mr. Martinez. (5 R.T. 877). As to prospective juror Mr. Martinez, the prosecutor stated that she believed his prior jury service in a criminal matter prosecuted by her office "might [have] tainted [the juror's view of the District Attorney's Office] for having brought such a petty crime" to trial. (5 R.T. 877—878). As to prospective juror Ms. Garcia, the prosecutor stated that she appeared to be "soft-hearted" because she worked for the Ventura County Public Health Department Community Outreach. (5 R.T. 878). Additionally, the prosecutor noted that when Ms. Garcia was asked about her ability to judge the credibility of witnesses, she stated that she tended to give people the "benefit of the doubt." (5 R.T. 878).

The trial court ultimately denied the Wheeler motion on the basis that there was no *prima facie* showing that the prosecutor

exercised peremptory challenges in a discriminatory fashion. (5 R.T. 879).

### 2. California Court of Appeal's Opinion

The California Court of Appeal denied Petitioner's <u>Batson</u> claim as follows:

> Here, the motion was properly denied under the first prong because [Petitioner] failed to identify a cognizable group upon which a <u>Batson/Wheeler</u> motion may be based. Counsel asserted that the prosecutor was engaging in the "systematic elimination of minorities." Our Supreme Court has recognized that such a generalized grouping of minorities is insufficient to trigger a <u>Batson/Wheeler</u> inquiry. [Petitioner's] belated attempt to identify Hispanics as the group upon which his challenge was based is unavailing. In any event, counsel's "meager" showing—consisting of the prosecutor's use of only five out of 36 possible peremptory challenges—was insufficient to support an inference of purposeful discrimination.
>
> Moreover, the prosecutor gave legitimate, nondiscriminatory reasons for each of the disputed peremptory challenges. In arguing otherwise, Petitioner essentially invites us to disregard the standard of review, which requires us to give deference to the court's ruling and affirm if the record suggests grounds upon which the prosecutor could have reasonably brought challenges for cause. During *voir dire*, prospective juror [Mr. Martinez] was critical of a prior criminal trial on which he sat as a juror and agreed with the prosecutor that the charge against the defendant was "incredibly petty." [Mr. Martinez]'s expression of a prior negative experience with the criminal justice system provided a race-neutral ground for the prosecutor to challenge him. Prospective juror [Ms. Garcia]'s background in social services provides a race-neutral reason for her exclusion. Finally, the race-neutral justification for prospective juror [Mr. Colon]'s exclusion lay in the fact that he previously served as a juror in a criminal case that resulted in a hung jury, as well as his expressed frustration with the legal system arising from his belief

that his nephew had been unfairly prosecuted. In light of these facts, Petitioner's <u>Batson/Wheeler</u> motion was properly denied.

(Docket Entry No. 17—14 at 11—12 (citations omitted)).

**3.   Analysis**

"The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race. . . ." <u>Batson v. Kentucky</u>, 476 U.S. 79, 86 (1986) (citation and footnote omitted). <u>Batson</u> established a three-step process governing a claim that the prosecutor used a peremptory challenge to strike a juror on account of race. <u>Snyder v. Louisiana</u>, 552 U.S. 472, 476-77 (2008); <u>Miller-El v. Dretke</u>, 545 U.S. 231, 239 (2005); <u>Kesser v. Cambra</u>, 465 F.3d 351, 359 (9th Cir. 2006) (en banc).

First, a defendant must establish a *prima facie* case of purposeful discrimination. <u>Snyder v. Louisiana</u>, 552 U.S. at 476-77; <u>Batson</u>, 476 U.S. at 93-95. To establish a *prima facie* case, the defendant must show that the prosecutor struck jurors of a particular race, gender, or ethnicity, and that, considering the totality of the circumstances, "these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of [the forbidden characteristic]." <u>Batson</u>, 476 U.S. at 94-97. Once a *prima facie* case has been shown, the burden shifts to the prosecution to "come forward with a race-neutral explanation" for the strike. <u>Snyder v. Louisiana</u>, 552 U.S. at 476-77; <u>Batson</u>, 476 U.S. at 97. If the prosecution meets this burden, the defendant then bears the burden to

13

prove that the prosecutor's proffered reason was pretextual, and that the real reason for the strike was discriminatory. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338-29 (2003); <u>Purkett v. Elem</u>, 514 U.S. 765, 767-68 (1995); <u>Ali v. Hickman</u>, 584 F.3d 1174, 1180 (9th Cir. 2009). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." <u>Purkett</u>, 514 U.S. at 768 (citation omitted).

"A reviewing court ordinarily should give [a trial court's credibility] findings great deference." <u>Batson</u>, 476 U.S. at 98 n.21; <u>see also</u> <u>Hernandez v. New York</u>, 500 U.S. 352, 365 (1991) ("evaluation of the prosecutor's state of mind based on demeanor and credibility lies [p]eculiarly within a trial judge's province") (citations omitted); <u>Williams v. Rhoades</u>, 354 F.3d 1101, 1109 (9th Cir. 2004).

At issue here is <u>Batson</u>'s first step. To establish a *prima facie* case of purposeful discrimination at <u>Batson</u>'s step one, the opponent of the peremptory strike "must show that (1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a peremptory strike to remove the juror and (3) the totality of the circumstances raises an inference that the strike was on account of race." <u>Crittenden v. Ayers</u>, 624 F.3d 943, 955 (9th Cir. 2010) (citing <u>Batson</u>, 476 U.S. at 96); <u>see also</u> <u>Johnson v. California</u>, 545 U.S. 162, 168 (a *prima facie* showing is made if "the totality of the relevant facts gives rise to an inference of discriminatory purpose." (quoting <u>Batson</u>, 476 U.S. at 93-94)); <u>Boyd v. Newland</u>, 467 F.3d 1139, 1143 (9th Cir. 2006) (same). In <u>Johnson v. California</u>, the Supreme Court held that "the burden at <u>Batson</u>'s first step was not intended

14

to be onerous:   'We do not intend the first step to be so onerous that a defendant would have to persuade the judge - on the basis of all the facts, some of which are impossible for the defendant to know with certainty - that the challenge was more likely than not the product of purposeful discrimination.  Instead, a defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination occurred.'"  Crittenden, 624 F.3d at 955 (quoting Johnson v. California, 545 U.S. at 170).

Respondent contends that the state court's decision was correct in finding no *prima facie* case of purposeful discrimination because the prosecutor's strikes against a generalized grouping of minorities, as opposed to a particular race, did not constitute a cognizable group for Batson purposes.  (Answer at 8—9).  There is no Supreme Court law expressly addressing the issue of whether peremptory challenges against minorities in general can sufficiently support a Batson challenge.  See Neuman v. Crogan, 2012 WL 4791814, at *9 (C.D. Cal. July 12, 2012) (state appellate court's finding that a Batson challenge cannot be based on "people of color" as a "cognizable group" did not contradict or involve an objectively unreasonable application of controlling Supreme Court cases).

However, striking even one juror on the basis of race violates the federal Constitution.  See Snyder, 552 U.S. at 478.  Moreover, it appears that Petitioner's claim in the instant petition concerns only the prosecutor's exercise of peremptory challenges against three potential Hispanic jurors: Mr. Martinez, Ms. Garcia, and Mr. Colon.

(Petition at 3—4; Docket Entry No. 7—15.)  The court will therefore analyze Petitioner's <u>Batson</u> claim on the alleged discrimination against those jurors only.

A *prima facie* case for a <u>Batson</u> claim can be established by offering a wide variety of evidence, as long as the sum of the proffered facts gives rise to an inference of discriminatory purpose. <u>Johnson</u>, 545 U.S. at 168.  For instance, a *prima facie* showing may be based on statistical disparities.  <u>Paulino v. Castro</u>, 371 F.3d 1083, 1091 (9th Cir. 2004).  The prosecutor's questions and statements during *voir dire* may provide insight into his or her motive.  <u>Batson</u>, 476 U.S. at 97.  In addition, a comparison of the stricken juror with jurors permitted to serve may shed light on whether there is a *prima facie* case.  <u>Crittenden</u>, 624 F.3d at 956.

A consideration of these factors does not indicate that the prosecutor had a discriminatory motive in dismissing the three Hispanic potential jurors.  The fact that the prosecutor used three of her 36 possible peremptory challenges (8.3%) to excuse Hispanic prospective jurors is insufficient in itself to support a finding of an inference of discrimination.  <u>See</u> <u>Hargrove v. Pliler</u>, 327 Fed. Appx. 708, 709 (9th Cir. 2009) (rejecting step-one <u>Batson</u> claim because it "hinges on a statistical argument involving very small numbers" that, "standing alone, is insufficient to establish a *prima facie* case in light of the ample legitimate reasons in the record for the prosecution's challenge"); <u>Fernandez v. Roe</u>, 286 F.3d 1073, 1078 (9th Cir. 2002) (noting that even if a prosecutor struck two out of two prospective jurors of a particular race, this alone may be

16

insufficient to support an inference of discrimination because "the numbers are so small (and hence, potentially unreliable)"); compare Paulino v. Castro, 371 F.3d 1083, 1091 (9th Cir. 2004) (finding a *prima facie* showing based on prosecutor's exclusion of five out of six black prospective jurors, *i.e.*, over 83 percent of his strikes were used to exclude black venirepersons).

Moreover, the number of strikes used by the prosecutor against Hispanic prospective jurors is only helpful in the context of assessing a step-one Batson claim if that number is compared to the overall percentage of Hispanics in the entire venire. See United States v. Esparsen, 930 F.2d 1461, 1467 (10th Cir. 1991) ("By itself, the number of challenges used against members of a particular race is not sufficient to establish or negate a *prima facie* case . . ."); accord Medellin v. Dretke, 371 F.3d 270, 278—79 (5th Cir. 2004) ("For the statistical evidence to be relevant, data concerning the entire jury pool is necessary.  The number of strikes used to excuse minority . . . jury pool members is irrelevant on its own."). Rather, "the number of persons struck takes on meaning only when coupled with other information such as the racial composition of the venire." United States v. Ochoa-Vasquez, 428 F.3d 1015, 1044 (11th Cir. 2005).

Here, the trial court record does not reflect the exact racial composition of the venire as a whole.  Petitioner has a responsibility to make an adequate record in the trial court supporting his step-one Batson showing. See Purkett v. Elem, 514 U.S. 765, 767—68 (1995) (the "burden of production" shifts to

opponent of <u>Batson</u> motion only at step two).  Because Petitioner has failed to produce a record of any statistical disparity, he cannot show that the California Court of Appeal's finding that "counsel's meager showing . . . was insufficient to support an inference of purposeful discrimination," (Docket Entry No. 17-14 at 11-12), amounted to an unreasonable determination of the facts.

In addition to a statistical analysis, "comparative juror analysis may be employed at step one to determine whether the petitioner has established a *prima facie* case of discrimination." <u>Crittenden v. Ayers</u>, 624 F.3d 943, 956 (9th Cir. 2010).  Comparative juror analysis involves comparing the characteristics of a struck juror with the characteristics of other potential jurors, particularly those jurors whom the prosecutor did not strike.  <u>See</u> <u>Miller-El</u>, 545 U.S. at 241.  "An inference of discrimination may arise where two or more potential jurors share the same relevant attributes but the prosecutor has challenged only the minority juror."  <u>United States v. Collins</u>, 551 F.3d 914, 921 (9th Cir. 2009). Comparative juror analysis may also involve "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group." <u>Boyd v. Newland</u>, 467 F.3d 1139, 1145 (9th Cir. 2004).  The fact that the prosecutor fails to "engage in meaningful questioning of any of the minority jurors" may support an inference of discrimination.  <u>Fernandez v. Roe</u>, 286 F.3d 1073, 1079 (9th Cir. 2002).

The prosecutor questioned each of the prospective jurors who indicated that they had prior jury experience on their jury questionnaire, about their experience. Two of the stricken Hispanic prospective jurors described prior jury experiences that were negative or potentially problematic for the prosecutor. For example, Mr. Martinez stated that he was previously a juror in a criminal case brought against a homeowner who had physically removed an unwanted guest at his own house. (3 R.T. 378, 418). The prosecutor asked Mr. Martinez whether he thought the charge brought against the homeowner was "extremely petty," and Mr. Martinez agreed. (3 R.T. 478). Accordingly, the prosecutor explained that she exercised a peremptory challenge against Mr. Martinez out of concern that his view of the district attorney's office might be tainted for having prosecuted such a petty crime. (5 R.T. 878). Mr. Colon stated that he had recently served on a criminal jury for a burglary charge that resulted in a hung jury, and that his nephew had been unfairly prosecuted for stabbing a man in self-defense at a gas station in Oxnard. (4 R.T. 671, 686—688). The fact that Mr. Colon served on a hung jury, combined with his prior negative experience with the criminal justice system, is a legitimate, race-neutral reason for exercising a challenge. Ngo v. Giurbino, 651 F.3d 1112, 1116 (9th Cir. 2011); Mitleider v. Hall, 391 F.3d 1039, 1048 (9th Cir. 2004).

In contrast with the stricken jurors, the jurors whom the prosecutor did not strike either had no prior jury experience or had reached a verdict during their prior jury experience. (1 Aug. C.T.

3, 15, 27, 39, 51, 63, 75, 87, 99, 111, 123, 135).[3]   Among the jurors who did have prior jury experience, nearly all of them explicitly noted having a positive experience.  (1 Aug. C.T. 3, 51, 87, 111, 135).   Thus, a comparative juror analysis does not give rise to an inference of discrimination with regard to Mr. Martinez or Mr. Colon.

As to prospective juror Ms. Garcia, the prosecutor stated that she appeared to be "soft-hearted" because, among other reasons, she worked for the Ventura County Public Health Department Community Outreach.  (5 R.T. 878).  Ms. Garcia stated during *voir dire* that she learned to give people "the benefit of the doubt" while "work[ing] a lot in the community . . . hear[ing] different things that are going on, . . . [like] family stuff that's happening . . . ."  (3 R.T. 483.)  The occupation of a potential juror may be a legitimate non-discriminatory reason to dismiss a potential juror, and a social worker falls within this reasoning.  United States v. Thompson, 827 F.2d 1254, 1260 (9th Cir. 1987) (dismissal of jurors based on occupation is within the prosecutor's prerogative); Messiah v. Duncan, 435 F.3d 186, 200 (2d Cir. 2006) ("full-time social service provider . . . might have more sympathy for a defendant" than other panelists); Hall v. Luebbers, 341 F.3d 706, 713 (9th Cir. 2003) ("Occupation is a permissible reason to defend against a Batson challenge, and being a social worker could be a legitimate basis to

---

[3] Juror TJ05 indicated on the jury questionnaire that he served on two prior juries, one of which did not reach a verdict. (1 Aug. C.T. 87). However, when further questioned about these jury experiences, he stated that they both reached a verdict. (4 R.T. 554—55).

20

strike a prospective juror."). Ms. Garcia's occupation as a social worker in the same county that Petitioner's crime occurred, combined with her statement that she learned to give members of her community the benefit of the doubt after working with them on a personal level, presented a valid race-neutral reason to strike her from the jury.

Only one of the other seated jurors arguably had a comparable job involving social work. Juror TJ10 was an eligibility worker for the Los Angeles County Department of Children and Family Services. (1 Aug. C.T. 109). Her job responsibilities involved processing medi-cal eligibility for children in foster care in Los Angeles County. However, unlike prospective juror Ms. Garcia, there is no evidence that Juror TJ10 spent significant time closely interacting with defendants like Petitioner on a personal level. Moreover, none of the other seated jurors had jobs involving social work. Therefore, a comparative juror analysis does not indicate that the prosecutor's reasons for striking Ms. Garcia were racially motivated.

Accordingly, the California Court of Appeal properly found that Petitioner had failed to demonstrate a *prima facie* case of discrimination and the California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.[4]

---

[4] Petitioner's failure to make the requisite *prima facie* showing renders it unnecessary for the Court to reach the second or third steps in the <u>Batson</u> analysis. <u>See</u> <u>Cooperwood v. Cambra</u>, 245 F.3d 1042 (9th Cir. 2001).

**B.    <u>Ground Two</u>**

In Ground Two, Petitioner asserts that the trial court violated his Sixth Amendment right to counsel by discussing a jury note outside the presence of Petitioner's counsel, Deputy Public Defender Gay Zide. (Petiton at 16).  In particular, Petitioner takes issue with a note that was approved by the court and given to the jury in response to a juror question requesting clarification on the definitions of each proposed murder charge.  (Petition at 29). Petitioner contends that the note was erroneous because it "simplistically reduced several complex theories of murder to a single sentence," failed to provide specific instructions on each theory, and informed the jury that all three defendants could be convicted of second degree murder under the theory of "natural and probable consequences." (Petition at 29—30).  Petitioner claims the court should have granted his motion for a new trial on that basis. (<u>Id.</u>)

**1.    Factual Background**

The California Court of Appeal summarized the following facts pertaining to Ground:

> During deliberations, the jury submitted a note asking for "further instruction/clarification because we are currently deadlocked on counts 1 [murder] & 2 [conspiracy to commit robbery]." A hearing was held in the presence of counsel at which the parties agreed to return the note to the jury with the question, "Can you be more specific about what instruction or clarification you desire?" The jury sent another note requesting "Clarification on procedures

22

for Count 1, conspiracy to commit robbery. Can we move to Count 2 without agreement on Count 1, for or against. [¶] Clarification on the definitions of each proposed murder charge." [4 C.T. 1055.]

After another unreported hearing that Zide did not attend, the parties agreed on the following response, which was in the prosecutor's handwriting:

"1) Yes. You may consider all the counts in any order you want.

2) The choices for Count 2 are:

-1st Degree Felony Murder as to all three defendants;
-1st or 2nd Degree Malice Murder as to [Petitioner] only
-2nd Degree (Natural & Probable Consequences) Murder as to all three defendants
-Voluntary Manslaughter as to [Petitioner] only
-Not Guilty

[] You must [] make individual de[c]i[s]ions as to each defendant. Please refer to the instructions for specific definitions[.]"

[4 C.T. 1056.]

At a hearing regarding another jury note the following day, Zide stated that she was not present at the previous hearing because she was in another courtroom making an appearance in another matter. She did, however, discuss the response to the jury question with the prosecutor and codefendants' counsel as they all sat in the hallway outside the courtroom. After taking "a brief look" at the response, counsel recalled stating that she was "going to have an objection" and added, "I did not authorize [Johnson's attorney] to lodge any objection for me. I assumed that I would be called before that answer to the question was going to be sent in. [¶] Now I know there are no jury instruction numbers, but there are page numbers, and I would have looked more closely at what got sent in.

[¶] So I'm lodging an objection to that...." Johnson's attorney then explained to the court: "I wrote you a note that said that [Zide] wants to have the page numbers, and so she objects to that, and that the three of us, [the prosecutor, Morrow's attorney] and myself would allow you to send in what it is, and that just preserved her objection for her. [¶] So I did alert the Court that she objected to that procedure." Zide replied, "I wanted to look at what went in, though, and I never got a chance to look at the final version." The court noted Zide's objection and added, "I did know you wanted the page numbers, and I didn't do anything about page numbers. They didn't ask that."

(Docket Entry No. 17—14 at 15—16).

## 2.   California Court of Appeal's Opinion

The California Court of Appeal rejected Petitioner's claim and found any possible error to be harmless:

After [Petitioner] was convicted, he moved for a new trial claiming, among other things, that his right to counsel had been violated when his attorney was deprived of the opportunity to approve the final response to the jury's questions regarding counts 1 and 2. Zide submitted a declaration stating she had merely "glanced briefly at the partial proposed response by the district attorney" and had "asked to be called before the answer went in to the jury." Zide also offered that she would have objected to the response being written in the prosecutor's handwriting.

In opposing [Petitioner's] new trial motion, the prosecutor asserted that "counsel [for Petitioner] was advised on and agreed to any and all responses that the court gave to the deliberating jury either in person or by way of having counsel for the other defendants stand in for her temporarily." In a supplemental declaration, the prosecutor stated that all counsel, including Zide, had met in the courtroom antechamber and hallway and had spent about 45 minutes discussing the proposed response. During that time, Zide was going in and out of another courtroom

24

pursuant to her calendar assignment. Zide, however, "was present and participating in the conversation" and viewed both the question and the proposed response. Zide also agreed to have Johnson's attorney standing in for her to accommodate her courtroom schedule. After they agreed on a final draft of the response, Johnson's attorney took the draft and went to confer with Zide. When he returned, he said he would stand in for Zide and appear on behalf of [Petitioner]. In support of the prosecutor's declaration, Johnson's attorney submitted a declaration stating that "there was discussion between all attorneys as to a possible answer." Johnson's attorney also stated, "It is possible I did appear for [Zide] as a courtesy as she was engaged in another Court." In a reply to the prosecutor's opposition, Zide filed a declaration stating she had "no recollection of either seeing or being asked to discuss" the jury's question and the proposed response.

At the hearing on the new trial motion, the prosecutor reiterated she had no "doubt in [her] mind that ... [Zide] was present and participating in every single discussion" and that Johnson's attorney appeared for Zide at the hearing on the matter. After hearing arguments, the court addressed Zide as follows: "Well, this is fairly troubling, 'cause it's pretty sloppy unfortunately. But I do have, although I can't say a precise memory, a fairly good memory of how this all played out." The court then stated that it recalled Zide conferring with the other attorneys in the antechamber. The court also recalled Johnson's attorney conveying Zide's objection to the response in that she "want[ed] the page numbers identified to this question." The court noted the objection at the time, but declined to give page numbers because the jury did not ask for them; moreover, the response instructed the jury to "go back and read all the other instructions to get the definitions for what we're talking about." To the extent Zide claimed that she had other objections, the court found credible Johnson's attorney's assertion no such objections were raised. The court also found it irrelevant that the response was in the prosecutor's handwriting because the jury would have had no reason to know who wrote it. Finally, the court concluded that any objections as to the form of the response would have been overruled and that the response gave a "completely neutral answer that ... doesn't pinpoint any different individual defendant. The fact [is] that [Petitioner] had more theories of culpability than the

25

others. That's just what the law is. So if it was error, I
find it harmless beyond a reasonable doubt 'cause that's
the answer that would have gone in. So the motion for new
trial is denied."

(Docket Entry No. 17—14 at 15—18).

The California Court of Appeal found that Petitioner's motion
was properly denied, reasoning that Petitioner's trial counsel "(1)
fully participated in the discussions on the proposed response to the
jury's questions; (2) had the opportunity to state any objections she
had to the proposed responses; (3) agreed to have Johnson's attorney
stand in for her at the hearing and appear on [Petitioner's] behalf;
and (4) interposed no objection to the form or substance of the
response, other than to request that the jury be directed to the page
numbers of the instructions for which clarification was sought."
(Id. at 18).  The court also found that any error occasioned by the
incident was harmless because the response was neutral and did not
favor either side and that Petitioner had failed to explain how a
different response would have led to a different result in his favor.
(Id. at 18—19).

**3.   Analysis**

The Sixth Amendment guarantees a defendant the right to be
present, personally or through counsel, when the court responds to
jury questions.  Rogers v. United States, 422 U.S. 35, 38-39 (1975);
United States v. Barragan-Devis, 133 F.3d 1287, 1289 (9th Cir.

1998).[5]   Moreover, "the right to personal presence at all critical
stages of the trial . . . [is a] fundamental right[] of each criminal
defendant[,]" <u>Rushen v. Spain</u>, 464 U.S. 114, 117 (1983), protected by
both the Confrontation Clause and Due Process.  <u>See</u> <u>United States v.</u>
<u>Gagnon</u>, 470 U.S. 522, 526 (1985) (<u>per</u> <u>curiam</u>) ("The constitutional
right to presence is rooted to a large extent in the Confrontation
Clause of the Sixth Amendment, but . . . is [also] protected by the
Due Process Clause in some situations where the defendant is not
actually confronting witnesses or evidence against him." (citation
omitted)).

However, a criminal defendant does not have a "constitutional
right to be present at every interaction between a judge and a juror
..." <u>United States v. Gagnon</u>, 470 U.S. 522, 526 (1985) (per curiam)
(internal quotation marks and citation omitted).   Thus, the "mere
occurrence of an *ex parte* conversation between a trial judge and a
juror does not constitute a deprivation of [a] constitutional right."
<u>Id.</u> (internal quotation marks and citation omitted).   Rather, the
"presence of a defendant is a condition of due process [only] to the
extent that a fair and just hearing would be thwarted by his absence
..." <u>Id.</u> (internal quotation marks and citations omitted).

---

[5]   Respondent contends that the Supreme Court authority from
which the Ninth Circuit derived this constitutional rule, <u>Rogers v.</u>
<u>United States</u>, 422 U.S. 35 (1975), was not a Confrontation Clause or
a Due Process decision, and therefore cannot form the basis for
relief under the AEDPA.  (Answer 15).   However, the right to presence
is a fundamental right that has been recognized by the Supreme Court
and constitutes "clearly established federal law" under 28 U.S.C.
2254(d)(1).  <u>See</u> <u>Rushen v. Spain</u>, 464 U.S. 114, 117 (1983).

Here, the trial court, after conducting a hearing in connection with Petitioner's new trial motion, determined that Petitioner's counsel had prior notice of the jury's question, fully participated in the discussions on the proposed response, and had the opportunity to object to the proposed responses. (See 18 R.T. 3223—3226). In a declaration submitted before the hearing, the prosecutor specifically recalled that counsel for Petitioner "was present and participating in the conversation," "viewed the question and the proposed answer that [they] were drafting," discussed with counsel for Johnson about appearing on her behalf at the hearing due to her other courtroom assignment, and ultimately agreed with counsel for Johnson that he would stand in for her at the hearing. (6 C.T. 1381). Counsel for Johnson, who had previously appeared as counsel for Petitioner on another jury question hearing just two days earlier (6 C.T. 1403), also stated that it was possible that he appeared again for her as she was engaged in another court. (6 C.T. 1385).

Given that the trial court, prosecutor, and counsel for co-defendant Johnson, specifically recalled that the parties collaborated on a response to the juror's note, and that defense counsel waived her personal presence at the hearing by giving permission to counsel for Johnson to stand in for her, the trial court's findings and its denial of Petitioner's claim was objectively reasonable. See Miller-El v. Cockrell, 537 U.S. 322, 339 (2003) (Under § 2254(d)(2), "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."). Moreover,

Petitioner has not provided any evidence to the contrary evidencing a constitutional deprivation of Petitioner's right to presence or counsel.

Even if the Court were to find that the trial court erred in proceeding with the hearing on the jury note without the presence of Petitioner's counsel, Petitioner is not entitled to relief because any error was harmless. <u>Rushen</u>, 464 U.S. at 119 n. 2; <u>Barragan-Devis</u>, 133 F.3d at 1289. The court in <u>Barragan-Devis</u> identified three factors to evaluate whether the error is harmless: (1) the probable effect of the message actually sent; (2) the likelihood that the court would have sent a different message had it consulted with petitioner's counsel prior to sending the message; and (3) whether any changes petitioner's counsel might have obtained would have affected the verdict in any way. <u>Barragan-Devis</u>, 133 F.3d at 1289 (citation omitted).

Here, the probable effect of the message sent was none, because the jury was not receiving any new information or new evidence to consider. The message simply clarified the various theories of culpability that applied to Petitioner and his codefendants, and was not directed at any particular defendant. It is unlikely that the court would have sent a different message, even if the judge had consulted with Petitioner's counsel. As the California Court of Appeal noted, Petitioner's counsel initially interposed no objection to the form or substance of the response, other than to request that the jury be directed to the page numbers of the instructions for which clarification was sought. Any further specification regarding

the various theories of murder would have been redundant given that the jury was expressly referred to other instructions for specific definitions of each theory.   The California Court of Appeal also pointed out that no prejudice could result from giving the jury the option to convict Petitioner of a lesser charge by convicting Petitioner of second degree murder on a natural and probable consequences theory. (Docket Entry No. 17-14 at 18-19).   Therefore, any error with regard to counsel's presence was harmless, and could not have had a substantial or injurious effect upon the jury's verdict.   Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

Finally, Petitioner's contention that the trial court "abused its discretion" under California law in denying his motion for a new trial is not cognizable on federal habeas review.   Federal courts may grant a writ of habeas corpus only if the petitioner's conviction or sentence is in "violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (noting that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Washington v. Horel, 2008 WL 4427221, at *4 (C.D. Cal. Sept. 30, 2008) (claim of abuse of discretion in denying new trial not cognizable in federal habeas proceedings).

Accordingly, the California Supreme Court's rejection of Petitioner's claim regarding his right to have counsel present at a discussion about the jury note was not contrary to, or an unreasonable application of, clearly established federal law.

# VII.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the District Court issue an Order: (1) accepting this Final Report and Recommendation, (2) denying the Petition for Writ of Habeas Corpus, and (3) directing that Judgment be entered dismissing this action with prejudice.

Dated: June 8, 2016

_____/s/_____
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE